IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>MAURICE HARGER,<br><br>    Defendant. | Case No. 17-cr-00479-CRB-1<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS** |

The government charges Defendant Maurice Harger ("Harger") with being a felon in possession of a firearm. See Indictment (dkt. 1) at 3–4. Harger moves to suppress evidence of the firearm, arguing that it was obtained through an unlawful search and seizure. See generally Motion (dkt. 18). For the reasons discussed below, the Court GRANTS the motion.

## I. BACKGROUND

### A. Two Anonymous Tips

On April 20, 2017, the San Francisco Police Department ("SFPD") received two anonymous calls on its non-emergency line, both of which were recorded. See Linker Decl. (dkt. 19), Ex. B.[1] The first call, placed at approximately 4:48 p.m., was from a woman reporting that the driver of a silver Toyota Sienna van parked near the Boys & Girls Club in the Bayview neighborhood of San Francisco had a gun and seemed to be "doing little drug transactions." Linker Decl., Ex. B, MH-000257 at 0:08–1:42. The caller

---

[1] Exhibit B to the Linker Declaration is a CD containing recordings of the anonymous telephone calls as well as computer aided dispatch (CAD) communications among the SFPD officers. The files are identified by Bates numbers (e.g., MH-000257, MH-000257a, etc.). The Court listened to recordings of the two calls at the motion hearing on May 3, 2018.

1   mentioned that there were kids around. Id. at 1:29–1:42. She described the driver as a
2   Black male "probably in his 30s" and said that the gun was "black in color," but she could
3   not describe the driver's clothing. Id. at 1:05–1:30. She provided the license plate number
4   of the van as 7RBF990, but when the SFPD operator confirmed the number as 7RBS990,
5   the caller stated that the operator was correct. Id. at 0:54–1:04. The caller refused to
6   provide her name or phone number. Id. at 1:42–1:45. After confirming that the Boys &
7   Girls Club was located at 195 Kiska Road in the Bayview, and that the silver Sienna was
8   parked across the street from the Club, the operator ended the call. Id. at 1:46–2:25.

The operator then made a broadcast to SFPD officers that there was a "Black male with a gun inside a vehicle" at 195 Kiska Road, and that the vehicle was a silver Toyota Sienna minivan with a license plate of 7RBS990. Linker Decl., Ex. B, MH-000257b at 0:01–0:06, 0:39–0:51. Seconds later, the operator noted that the plate number "actually comes back to a Honda." Id. at 0:53–0:55. SFPD officers arrived at 195 Kiska Road shortly thereafter. See id. at 1:00. The officers at the scene requested the vehicle's license plate number, and a second operator responded, "7RBS990." Id. at 1:05–1:10. The first operator, who had taken the call, then chimed in, saying that the person with a gun was reportedly in the driver's seat "doing drug transactions." Id. at 1:13–1:18. Neither operator said anything to the officers about the presence of children. Id., 257b. Unable to locate the reported vehicle or person with the gun, one officer asked who had called in the report. Id. at 1:33–1:37. The second operator stated that it "was called in by an anonymous person." Id. at 1:38–1:40. When asked if there was a call-back number, the same operator said there was no call-back number because the tip was "called in from the non-emergency line." Id. at 1:49–1:54. The SFPD officers on scene could not locate the reported van or driver.

About forty minutes after the first call, at approximately 5:27 p.m., the SFPD received a second anonymous call on its non-emergency line. See Linker Decl., Ex. B, MH-000258 at 0:01–0:09. The anonymous caller—whom the parties agree was the same person from the first call—reported a "silver Sienna" near the Boys & Girls Club on Kiska

Road and stated that "they have a gun." Id. at 0:06–0:18. The caller did not mention drug-dealing or children at all in this second call. Id., 258. The caller provided the van's license plate number as 7RBF990 and described the person with the gun as a "light-skinned" "African-American" wearing a black shirt and a hat. Id. at 0:41–1:31. When asked about the person's age, however, the caller responded that she didn't know. Id. at 0:44–0:47. Moreover, when asked for her name, the caller refused to give it, exclaiming, "I'm not giving you my name!" Id. at 1:31–1:34. According to the caller, she had seen the person with the gun when she had walked by, but because she had been on hold for ten minutes, she was unsure if the person was still there. Id. at 2:03–2:23. "You guys took so long to answer the non-emergency line," she told the operator. Id. at 1:45–1:50. On this occasion, unlike the first, the system recorded the caller's phone number. See Linker Decl., Ex. A, MH-000012 (phone number redacted).

About two minutes after the completion of this second anonymous call, the operator who had taken the first call broadcasted to SFPD officers that a "return call" had been made regarding a male with a gun in a silver Sienna in front of the Boys & Girls Club on Kiska Road. Linker Decl., Ex. B, MH-000258b at 2:21–2:34. The operator stated that the suspect was a Black male in a black shirt, and that the license plate number 7RBF990 was returning a Toyota Sienna with a registered owner in San Francisco. Id. at 2:39–2:45, 4:09–4:28. The operator said nothing about the presence of children. Id., 258b. The operator did note that the anonymous caller was "refusing to give their name and phone number." Id. at 2:45–2:48. Various SFPD units responded to the broadcast. Id. at 2:50–3:02. Several minutes later, at approximately 5:35 p.m., SFPD Sergeant Thomas Moran ("Moran") reported that he—along with his partner, Sergeant Patrick Griffin ("Griffin")—had found the vehicle, had "one detained," and no further assistance was required. Id. at 5:57–6:22; see also Linker Decl., Ex. A, MH-000038.

**B.    SFPD Officers' Interactions with Harger**

On the afternoon of the two anonymous calls, Sergeants Griffin and Moran—part of the SFPD Gang Task Force—were on patrol in the Bayview-Hunters Point neighborhood

3

of San Francisco. Griffin Decl. (dkt. 24-1) ¶ 3. Griffin has patrolled the Bayview-Hunters Point area, including the area around the Boys & Girls Club on Kiska Road, for several years. Id. ¶ 2. Griffin states that, based on his experience, he knows the neighborhood to be "a narcotics-prone and violent crime-prone area, with substantial gang activity involving multiple gangs and multiple recent shootings around April of 2017." Id. On the afternoon in question, both Griffin and Moran were in plainclothes and driving in an unmarked police SUV. Id. ¶ 3.

At approximately 4:48 that afternoon, Griffin and Moran heard a broadcast over the radio about the first anonymous call. Id. ¶ 4. In particular, they heard that an anonymous person had reported a Black adult male with a gun inside a Toyota Sienna, with license plate 7RBS990, in the vicinity of 195 Kiska Road. Id. They also heard that the person was reportedly in the driver's seat and possibly engaging in drug transactions. Id. About forty minutes later, Griffin and Moran heard a broadcast about the second anonymous call and the report of a suspect with a gun in a silver Toyota Sienna, with license plate 7RBF990, at the Boys & Girls Club on Kiska Road. Id. ¶ 5.

Griffin and Moran responded to the second tip and within minutes arrived at the Boys & Girls Club on Kiska Road. Id. ¶ 6. Upon arrival, Griffin observed that a silver Toyota Sienna with a license plate of 7RBF990 was parked across the street from the Club, perpendicular to the curb, with its front facing away from the street and towards the curb. Id. Without any further observation, Griffin and Moran pulled up directly behind the van and deliberately parked their SUV perpendicular to the back of the van, blocking it from leaving. Id. Although there remained "several feet" between the SUV and the van, the van could not have backed out of its parking spot without hitting the SUV. See id.; Harger Decl. (dkt. 21) ¶ 3; see also Linker Decl., Ex. C.[2]

Griffin and Moran exited their vehicle and approached Harger, who was standing outside the van near the driver's side door. Griffin Decl. ¶ 7. Neither officer drew a

---

[2] At the motion hearing on May 3, 2018, the government's counsel agreed that Harger's van could not have backed out of its parking spot without hitting the officers' SUV.

4

weapon. Id. ¶ 9. Griffin observed that Harger was wearing a black shirt and a black hat. Id. ¶ 7. Griffin also noticed at this time that the engine of the van was running and that there was a toddler strapped into a seat inside the van. Id. Then, without asking for permission, Griffin began questioning Harger about the reported gun in a calm but firm tone. See id. ¶¶ 9–10; Harger Decl. ¶ 4. During this time, Griffin repeatedly asked Harger whether the officers could search the van, but Harger never consented to a search of the van. See Griffin Decl. ¶ 10; Harger Decl. ¶ 4.

At some point—the parties dispute exactly when—Griffin smelled a "strong odor" of marijuana emanating from the open driver's side window, and he observed loose marijuana on the floorboard in front of the driver's seat. See Griffin Decl. ¶¶ 11–13; Harger Decl. ¶ 5. At this point, the officers told Harger to sit on the curb while they searched his van. Griffin Decl. ¶ 16. The officers' search revealed a large amount of marijuana and other controlled substances in the van, as well as a gun, which was found in a backpack in the trunk area of the van. Id. ¶¶ 16–17.

Harger argues that all of this evidence, including the gun, must be suppressed because it was obtained through an illegal search and seizure.

## II. LEGAL STANDARD

The Fourth Amendment protects people and their property from "unreasonable searches and seizures." U.S. Const. amend. IV. A "search" within the meaning of the Fourth Amendment occurs when police officers either infringe an individual's reasonable expectation of privacy or physically occupy private property for purposes of obtaining information. United States v. Lundin, 817 F.3d 1151, 1158 (9th Cir. 2016); see also United States v. Jones, 565 U.S. 400, 404–05 (2012); United States v. Jacobsen, 466 U.S. 109, 113 (1984). A "seizure" occurs "when there is a governmental termination of freedom of movement through means intentionally applied." United States v. Al Nasser, 555 F.3d 722, 728 (9th Cir. 2009) (quoting Brower v. Cty. of Inyo, 489 U.S. 593, 596–97 (1989)) (emphasis omitted); see also Soldal v. Cook Cty., 506 U.S. 56, 61 (1992) (quoting Jacobsen, 466 U.S. at 113) (a seizure of property "is some meaningful interference with an

5

individual's possessory interest in that property").

Warrantless searches and seizures are presumed to be unreasonable unless they fall within "a few specifically established and well-delineated exceptions." United States v. Scott, 705 F.3d 410, 416 (9th Cir. 2012). Under Terry v. Ohio and its progeny, a temporary seizure is reasonable under the Fourth Amendment if law enforcement officers have "reasonable suspicion"—that is, "some objective manifestation" under the circumstances—that the person has committed, or is about to commit, a crime. United States v. Cortez, 449 U.S. 411, 417 (1981); Terry v. Ohio; 392 U.S. 1, 30 (1968). Additionally, under the "automobile exception," police officers may conduct a warrantless search of a vehicle "if there is probable cause to believe that the vehicle contains evidence of a crime." Scott, 705 F.3d at 417. The government bears the burden of proving that a warrantless search or seizure does not violate the Fourth Amendment. Id. at 416. If the government fails to meet this burden, evidence obtained as a result of the illegal search or seizure cannot "constitute proof against the victim." Wong Sun v. United States, 371 U.S. 471, 484 (1963); see also Lundin, 817 F.3d at 1157.

## III. DISCUSSION

In deciding whether to suppress the evidence in this case, including evidence of the gun, the Court must determine two issues: (1) the point at which the officers' interaction with Harger implicated the Fourth Amendment; and (2) at that point, whether the officers' conduct violated the Fourth Amendment. The Court finds that the officers seized Harger's vehicle when they deliberately parked directly behind it and blocked it from leaving. Because at that point the officers lacked reasonable suspicion for such a seizure, the officers' conduct violated the Fourth Amendment, and suppression is warranted.

### A. The officers seized Harger's vehicle when they deliberately parked behind it and blocked it from leaving

A seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied." Brower, 489 U.S. at 596–97 (emphasis in original); see also Soldal, 506 U.S. at 61 (property is seized "when there is some

meaningful interference with an individual's possessory interest in that property"). Accordingly, in United States v. Nunn, another court in this district found that when police officers parked behind the defendant's vehicle, causing the vehicle to become blocked between the curb in front of it and the patrol car behind it, the officers intentionally terminated the vehicle's freedom of movement, and therefore seized it. No. 14-cr-636, 2015 WL 3764181, at *4 (N.D. Cal. June 16, 2015) (Henderson, J.). This case is no different. Here, Griffin and Moran deliberately parked their SUV perpendicular to the back of Harger's van and blocked it from leaving. See Griffin Decl. ¶ 6 ("Because we had been advised that the individual in the vehicle had a firearm, we parked our SUV behind the vehicle."); see also Linker Decl., Ex. C. By doing so, the officers terminated the van's "freedom of movement through means intentionally applied," and thus seized the van. See Brower, 489 U.S. at 596–97.

The government, however, contends that this case is controlled by United States v. Kim, 25 F.3d 1426 (9th Cir. 1994). In Kim, two agents in plainclothes from the Drug Enforcement Administration ("DEA") parked behind Kim's already parked car, partially blocking it in. 25 F.3d at 1428. One of the agents then approached the driver's side of the car (opposite Kim, who was sitting in the passenger seat), identified himself as a DEA agent, and requested permission to ask some questions. Id. The court concluded that under these circumstances, Kim was not involuntarily stopped, and was not seized. Id. at 1430–31.

The court in Kim—crucially—made no finding as to whether Kim's vehicle was seized. See id.[3] In fact, if anything, the court distinguished between a seizure of Kim and a seizure of his vehicle. See id. at 1431 n.2 ("Even if Agent Aiu had more completely blocked the departure of Kim's automobile, Kim enjoyed greater latitude during his initial conversations with Agent Aiu to depart, even if on foot, than that enjoyed by the more

---

[3] Kim did not make an argument that his car was seized. In Kim, the police recovered a vial of crystal methamphetamine that was in Kim's pocket; they did not seize any evidence from Kim's vehicle. See 25 F.3d at 1428–29.

7

closely hemmed-in suspect whom, approached from two sides with his back against a pillar inside an airport terminal, we deemed not to have been stopped in $25,000 U.S. Currency. 853 F.2d at 1504–05 . . . .").[4] Moreover, the court in Kim made clear that a seizure is not foreclosed merely because officers come upon an already stationary vehicle or person; rather, the court concluded that no seizure occurred because the agents explicitly requested permission to ask some questions, and their position "did not entirely bar Kim's egress." Id. at 1431.[5] But here, the SFPD officers entirely barred Harger's van from moving and did not indicate in any way that Harger or his van could leave. See Harger Decl. ¶ 4; Griffin Decl. ¶¶ 9–10. Thus, that the officers entirely terminated the future progress of Harger's van is dispositive in this case. Kim is inapplicable. The officers here seized the van when they deliberately parked behind it and blocked it from leaving. See Brower, 489 U.S. at 596–97; Soldal, 506 U.S. at 61.[6]

**B.    The officers lacked reasonable suspicion to seize Harger's vehicle**

Because a Fourth Amendment seizure occurred when the officers deliberately parked behind and blocked Harger's van, at that point the officers needed reasonable

---

[4] In Nunn, the district court expressly distinguished between seizure of a person and seizure of the person's vehicle. See 2015 WL 3764181 at *3–4. With respect to Nunn himself, the district court applied the binding precedent of Kim and found that Nunn was not seized, but the court nevertheless expressed "concern with the dubious reasoning in Kim." Id. at *4. "It is pure fiction, even if indeed a legal one, that an individual could feel free to leave and ignore the presence of police officers after a patrol car parks directly behind their vehicle." Id.

[5] Kim cites to United States v. Pajari, 715 F.2d 1378 (8th Cir. 1983), in support of its conclusion that the agents' partial blockage of Kim's egress did not constitute a stop. See Kim, 25 F.3d at 1431. But the part of Pajari to which Kim refers is a mere recitation of the testimony of a DEA agent that "officers did not stop Pajari's car but simply parked behind his car." See id.; Pajari, 715 F.2d at 1380. Nothing in the facts of Pajari, however, indicates that the officers' vehicle blocked Pajari's car from moving or leaving. See 715 F.2d at 1380. Moreover, at the time the officers parked behind Pajari's car, a known informant had purchased cocaine obtained from Pajari, the officers had observed Pajari enter a building where he stayed for twenty minutes, and the officers knew a search warrant had been secured authorizing the search of Pajari's residence. See id. at 1380. Pajari is an entirely different case from this one.

[6] Kim states in a footnote that "other circuits in factually similar cases have consistently held that an officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure. [citations omitted]." 25 F.3d at 1430 n.1. This is an unremarkable proposition. The issue here is not that the officers approached Harger's van but rather that they parked immediately behind it and entirely terminated its freedom of movement.

8

1  suspicion that criminal activity was "afoot" for the seizure to be lawful.  See Terry, 392
2  U.S. at 30.  Whether reasonable suspicion exists depends on the totality of the
3  circumstances, including "both the content of information possessed by police and its
4  degree of reliability."  Alabama v. White, 496 U.S. 325, 330 (1990).  The information that
5  courts evaluate is that which is known to law enforcement officers at the time of the Fourth
6  Amendment event at issue.  Moreno v. Baca, 431 F.3d 633, 639 (9th Cir. 2005).  In this
7  case, when the officers seized Harger's vehicle, the only information known to them
8  consisted of (1) the two anonymous tips; (2) Harger's location, across the street from a
9  youth center; and (3) Griffin's professed knowledge that the Bayview neighborhood of San
10 Francisco is a "narcotics-prone and violent crime-prone area."  See Griffin Decl. ¶¶ 2–6.
11 This information did not provide reasonable suspicion to justify seizure of Harger's vehicle
12 under the Fourth Amendment.

### 1. The Anonymous Tips

Anonymous tips "are generally less reliable than tips from known informants and can form the basis for reasonable suspicion only if accompanied by specific indicia of reliability."  Florida v. J.L., 529 U.S. 266, 269 (2000).  In J.L., the Court unanimously found that an anonymous tip alone was insufficient to justify an investigatory stop.  Id. at 271–74.  In that case, the police received a call by an unidentified person, calling from an unidentified location, and reporting that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  Id. at 268.  Police officers responded to the bus stop and found three black males, one of whom was wearing a plaid shirt.  Id. Based on only the anonymous tip, one of the officers approached J.L., told him to put his hands up, frisked him, and seized a gun his pocket.  Id.  The Court held that the officers lacked reasonable suspicion because the tip "provided no predictive information" that would have allowed the officers "to test the informant's knowledge or credibility" about crime that may be afoot.  Id. at 271.  While the anonymous tip of course provided an accurate description of J.L.'s location and appearance, such "readily observable" details showed nothing about the tipster's "knowledge of concealed criminal activity."  Id. at 272.

United States District Court
Northern District of California

1    Reasonable suspicion, the Court emphasized, "requires that a tip be reliable in its assertion

2    of illegality, not just in its tendency to identify a determinate person." Id. Accordingly,

3    the tip lacked sufficient indicia of reliability to provide the officers with reasonable

4    suspicion for their investigatory stop. Id. at 274.

5        The present case is like J.L. in every way that matters. First, like in J.L., the

6    anonymous tips here were reports of a Black male with a gun. See id. at 268; Linker Decl.,

7    Ex. B, MH-000257 and MH-000258. Second, the caller remained unidentified; in fact,

8    when asked, the caller affirmatively refused to provide her name and phone number. See

9    Linker Decl., Ex. B, MH-000257 at 1:42–1:45; MH-000258 at 1:31–1:34. In both

10   instances, the operator broadcasting the tip to the SFPD officers noted that the informant

11   was an anonymous person who had called the non-emergency line. Linker Decl., Ex. B,

12   MH-000257b at 1:38–1:54; MH-000258b at 2:45–2:48. Third, the content of the tips

13   consisted only of the types of "readily observable" facts that J.L. found were insufficient

14   indicia of reliability: the color, model, and license plate of the van; its location; the color of

15   the gun; and the appearance of the defendant. See 529 U.S. at 271–72; Linker Decl., Ex.

16   B, MH-000257 and MH-000258. None of these details indicate that the anonymous caller

17   had "knowledge of concealed criminal activity." See J.L., 529 U.S. at 272.[7]

18       In an attempt to distinguish J.L., the government argues that the two calls here were

19   by the same caller, and both were recorded. Opposition at 13–14. But not only did the

20   second call provide merely the same types of "readily observable" facts as the first call, it

21   also failed to corroborate fully the details of the first call. For example, the second call

22   contained no mention of drug transactions, or the presence of children, and when asked

23   during the second call about the suspect's age, the caller said, "I don't know," even though

24   she had stated during the first call that the person was "probably in his 30s." Compare

---

[7] Indeed, the government conceded at the motion hearing that "there is no indicia of reliability" in the calls. See Linker Decl. (dkt. 44) Ex. G at 13:23–14:1; see also id. at 14:16–21 ("Court: And what I'm saying is the calls in and of themselves, because I think you have to look at them, do they have any in indicia of reliability? No. Do they have any indicia of predictability? No. Is that correct? Ms. Schott: Correct.").

10

Linker Decl., Ex. B, MH-000257 with Linker Decl., Ex. B, MH-000258. Thus, that there were two calls in this case is—if anything—an indicium of unreliability, not reliability. Moreover, as shown by the SFPD's failure to verify anything from the first tip, that the calls were recorded did not provide any "means to test the informant's knowledge or credibility," and thus does not distinguish this case from J.L. See J.L., 529 U.S. at 271; Linker Decl., Ex. B, MH-000257b. Like the tip in J.L., the anonymous tips here lacked sufficient indicia of reliability in their "assertion of illegality" to provide the officers with reasonable suspicion to seize Harger's vehicle. See J.L., 529 U.S. at 272.

The cases that would compel a different conclusion vary significantly from the facts here. In Alabama v. White, which the Court classified as a "close case," the anonymous caller predicted the defendant's future behavior, and the police officers independently corroborated the tip. 496 U.S. 325, 327–32 (1990). In particular, the police in that case received an anonymous tip asserting that a woman was carrying cocaine—and predicting that she would leave an apartment building at a specific time, get into a specific car, and drive to a specific motel. Id. at 327. The officers observed White leave the specified apartment building at the specified time, saw her get into a car matching the tipster's description, and followed White to the specified motel. Id. The Court concluded that because the anonymous tip contained details relating to future actions ordinarily not easily predicted, which the officers independently corroborated, the tip exhibited a sufficient degree of reliability to furnish the officers with reasonable suspicion that White was engaged in criminal activity. Id. at 331–32. Here, unlike in White, neither of the calls contained any details relating to future actions ordinarily not easily predicted. See Linker Decl., Ex. B, MH-000257 and MH-000258.

In Navarette v. California, another "close case," the anonymous caller used the 911 system to report a specific, ongoing, and dangerous crime. 134 S. Ct. 1683, 1688–92 (2014). Specifically, the unidentified informant called 911, reported that a truck had run her off the road about five minutes prior, and provided the location and description of the offending truck. Id. at 1686–87. After a dispatcher relayed the tip, officers responded to

11

the broadcast, pulled the vehicle over, smelled marijuana, searched the truck, and found thirty pounds of marijuana. Id. at 1687. In holding that the anonymous tip was sufficiently reliable to provide the officers with reasonable suspicion of drunk driving, the Court emphasized that the caller had used the 911 system, which allows law enforcement "to verify important information about the caller" and thus "provides some safeguards against making false reports with immunity." Id. at 1689–90; see also United States v. Terry-Crespo, 356 F.3d 1170, 1176 (9th Cir. 2004) (emphasizing that the use of the 911 system lends support to a tip's credibility, because calling 911 exposes a caller to "legal sanction"). Moreover, the caller reported "a specific and dangerous result of the driver's conduct: running another car off the highway." Id. at 1691. Similarly, in United States v. Edwards, the Ninth Circuit found that an anonymous 911 report of a "young black male" shooting at passing cars provided the responding officers with reasonable suspicion of criminal activity because the anonymous caller not only was reporting an "ongoing emergency situation" but also used the 911 system, which lent "further credibility to his allegations." 761 F.3d 977, 980–85 (9th Cir. 2014).

This case is quite different from Navarette and Edwards. Not only did the anonymous caller affirmatively refuse to provide her name or phone number, she also knowingly used the SFPD's non-emergency line and, at least on the second call, waited on hold for nearly ten minutes. Linker Decl., Ex. B, MH-000257 at 1:42–1:45; MH-000258 at 1:45–1:50 ("You guys took so long to answer the non-emergency line."). Moreover, the anonymous caller did not report any "specific and dangerous result of the [defendant's] conduct" that would have indicated that her tip was "reliable in its assertion of illegality," rather than merely in "its tendency to identify a determinate person." See Navarette, 134 S. Ct. at 1691; J.L., 529 U.S. at 272; Linker Decl., Ex. B, MH-000257 and MH-000258. Accordingly, Navarette and Edwards do not compel a result in this case different from the one in J.L.

This is not to say that the officers here should have disregarded the anonymous tips. Of course, "police officers would be derelict in their duties if they disregarded all

12

anonymous calls of firearms in cars or drug dealing around children." See Opposition (dkt. 24) at 13; see also United States v. Williams, 846 F.3d 303, 310 (9th Cir. 2016) ("After receiving the information provided by the tipster, the officers would have been delinquent had they not driven over to the parking lot to investigate the situation."). But the officers here—knowing that the tips were anonymous, that the caller had used a non-emergency line and refused to provide a name or phone number, that the content of the tips consisted of only "readily observable" information, and that no one had been able to corroborate the first tip in any way—had several options besides immediately seizing Harger's van. For example, they could have observed the situation for a short period of time from across the street; they could have parked nearby, approached Harger on foot, and asked to question him; they even could have walked up to the van, peered in the windows from the outside, and observed anything in plain view. See United States v. Lowe, 791 F.3d 424, 436 (3d Cir. 2015) ("Officers proceeding on the basis of an anonymous tip that does not itself give rise to reasonable suspicion have many tools at their disposal to gather additional evidence" to try to satisfy Terry, including "investigation, surveillance, and even approaching the suspect without a show of authority to pose questions and to make observations. . . .").

Thus, while the anonymous tips provided the officers with justification to investigate further, the tips did not provide the officers reasonable suspicion to seize Harger's vehicle in the manner that they did.

### 2. Proximity to a Youth Center

Following the motion hearing in this case, the Court asked the parties to submit supplemental briefing on an issue that had not received much attention in the parties' initial briefing: what impact the report of a gun and of drug-dealing <u>in the proximity of a youth recreation center</u> should have on the Court's analysis. See Order (dkt. 31).[8] Harger

---

[8] In their responses, the parties righty focused on the report of a firearm. As Harger points out, the anonymous tipster here only mentioned drug-dealing in the first call, which the police were not able to corroborate; the tipster did not mention drug-dealing in the second call. See Def. Br. (dkt. 41) at 4.

13

responded that J.L. itself provides guidance on the issue of unreliable tips about firearms: "we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in Adams and White does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." Def. Br. at 1 (quoting J.L., 529 U.S. at 274). Indeed, the Court in J.L. observed that while "[f]irearms are dangerous," "an automatic firearm exception to our established reliability analysis would rove too far." 529 U.S. at 272.

The government, after first discussing two highly distinguishable cases,[9] directed the Court to a different portion of J.L. Gov Br. (dkt. 39) at 4–6 (citing J.L., 529 U.S. at 273–74). In that portion of J.L., the Court commented that the facts before it did "not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability," and suggested that it might treat a report of a bomb differently than a report of a firearm. 529 U.S. at 273–74. The Court went on: "Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports . . . and schools, see New Jersey v. T.L.O., 469 U.S. 325 . . . (1985), cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere." Id. at 274. The government asserts that it is not arguing for the "firearm exception" that J.L. rejected, but for "the common-sense school exception" that J.L., and T.L.O. both recognized. Gov. Reply Br. (dkt. 42) at 4. The government thus

---

[9] See Gov. Br. (dkt. 39) at 4 (citing United States v. Mackie, No. 17-10060, 2018 WL 1979032 (9th Cir. Apr. 27, 2018), and United States v. Williams, 846 F.3d 303 (9th Cir. 2016)). The government cites both cases for the unchallenged proposition that the Ninth Circuit has found anonymous tips to be reliable. But Mackie involved an in-person tip (apparently anonymous because the officers decided to pursue the defendant rather than further question the tipster), which the court deemed sufficiently reliable under United States v. Palos-Marquez, 591 F.3d 1272, 1275 (9th Cir. 2010) (holding that the "in person nature of a tip gives it substantial indicia of reliability"). 2018 WL 1979032, at *1. The officers in Mackie were also able to corroborate the tip based on the defendant's behavior—attempting to evade the police, walking with his arms at an unnatural angle, etc. Id. Here, there was neither an in-person tip, nor did the officers make any observations of Harger before seizing his vehicle. Likewise, in Williams, the Ninth Circuit held that the tip was reliable, but the tipster there "provided his name, address, and phone number," and the officers also observed the defendant's suspicious behavior at the scene—popping up in his seat, looking from side to side, placing the car in reverse, and "ultimately darting away on foot." 846 F.3d at 309–10. Here, the tipster did not provide her name, address, and telephone number, and the officers made no observations of Harger before seizing his vehicle.

14

asks the Court to expand T.L.O.'s school exception beyond schools to what the government calls "the youth center environment," where, it argues, officers should be "permitted to 'conduct protective searches on the basis of information insufficient to justify searches elsewhere.'" See Gov. Br. at 6–7 (quoting J.L., 529 U.S. at 274).[10]

The government's position has no merit. First, the danger alleged here was not a bomb or something else of equivalent menace "so great as to justify a search even without a showing of reliability." See J.L., 529 U.S. at 273. It was the precise danger at issue in J.L.: a firearm. See id. at 269. Second, despite the government's fuzzy characterization of "the youth center environment," Gov. Br. at 6, Harger was parked in a public parking area across the street from a youth center. Griffin Decl. ¶ 6. Public parking areas across from youth centers are not "quarters where the reasonable expectation of Fourth Amendment privacy is diminished," akin to airports and schools. See J.L., 529 U.S. at 274. They are not quarters at all. They are much more like the bus stop where J.L. was standing. See id. at 268.

Third, T.L.O. does not support the government's "youth center environment" exception. T.L.O. relaxed the probable cause and warrant requirements for school searches conducted by school administrators, holding that such searches require only reasonable suspicion. See 469 U.S. at 341, (rejecting "strict adherence to the requirement that searches be based on probable cause"), 345–46 (discussing Terry, "requirement of reasonable suspicion"). What motivated the Court in T.L.O. was not simply the presence of children, but the special circumstances of school administration. See id. at 338 ("Today's public school officials . . . act in furtherance of publicly mandated educational and disciplinary policies"); id. at 339–40 ("substantial interest of teachers and

---

[10] The government also argues that "[w]hen the SFPD sergeants responded to the second call, at 5:27 pm, on a Thursday, the youth center would have been open, and it would have been reasonable for the sergeants to believe that children would have been present. . . . Indeed, the anonymous informant noted in her first call that children were present." Id. But the SFPD operator did not convey to the officers that the tipster had stated in the first call that there were children present, and neither the tipster nor the SFPD operator mentioned children in connection with the second call. Linker Decl., Ex. B, MH-000257b; Linker Decl., Ex. B, MH-000258. Nor is there any evidence in the record that the officers knew the youth center's hours.

15

administrators in maintaining discipline in the classroom and in school grounds"; "preservation of order and a proper education environment requires close supervision of schoolchildren"); see also Calabretta v. Floyd, 189 F.3d 808, 816 (9th Cir. 1999) (noting that "Appellants would have us read T.L.O. as a blanket suspension of ordinary Fourth Amendment requirements where children are involved," but that, in T.L.O., "it was 'the school setting' that requires some easing of the restrictions to which searches by public authorities are ordinarily subject."). Moreover, T.L.O. pertained to searches by school administrators, not law enforcement. 469 U.S. at 342 n.7 ("We here consider only searches conducted by school authorities acting alone and on their own authority."). T.L.O. does not justify the seizure of a vehicle, not at a school or even at a youth center, but at a public parking area across the street from a youth center, conducted not by school administrators but by law enforcement, based on less than reasonable suspicion. See Gov. Br. at 7 (arguing that "the SFPD sergeants in the case at bar did not need reasonable suspicion").

The Court is not persuaded that the report of wrongdoing in close proximity to a youth center distinguishes this case from J.L., or that this case falls within the school exception, or any other exception, recognized by J.L. The officers here required reasonable suspicion, and the tips did not provide it.

### 3. Crime-Prone Neighborhood

Finally, the government suggests that Griffin's familiarity with and knowledge of the Bayview-Hunters Point neighborhood as a "narcotics-prone and violent crime-prone area" supports a reasonable suspicion that Harger was engaging in criminal activity. See Opposition at 14. Such an argument "requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." See United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000). "We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed

locations where particular crimes occur with unusual regularity." Id. Here, besides a bare-bones assertion by Griffin that he "knows" that the Bayview-Hunters Point area is a "narcotics-prone and violent crime-prone area," the government provides no factual basis to support a belief that the area around 195 Kiska Road is particularly crime-ridden. See Griffin Decl. ¶ 2. Accordingly, Griffin's assertion (alone or in combination with the anonymous tips) does not provide a reasonable, particularized suspicion that Harger was engaging in criminal activity. See Montero-Camargo, 208 F.3d at 1138. At the point that the officers seized Harger's vehicle, they lacked reasonable suspicion of criminal activity, and therefore they violated Harger's rights under the Fourth Amendment.

### C. Suppression is warranted

Because the officers unreasonably seized Harger's van, the evidence that the officers subsequently obtained, including the evidence of the gun, should be suppressed as "fruit of the poisonous tree." See Wong Sun, 371 U.S. at 488. Under the fruit-of-the-poisonous tree doctrine, evidence obtained subsequent to an unreasonable search or seizure is "tainted by illegality and is inadmissible," unless "purged of the primary taint." Washington, 490 F.3d at 774 (internal quotation marks omitted) (quoting Wong Sun, 371 U.S. at 488). The question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Song, 371 U.S. at 488. Here, the discovery of the gun followed directly from the unlawful seizure, and there are no intervening circumstances to purge the taint of illegality. See Griffin Decl. ¶¶ 10–17. At the motion hearing, the government's counsel agreed to a hypothetical from the Court making just this point.[11] Hence, the evidence here is suppressed. See Wong Sun, 371 U.S. at 488.

The government nevertheless asserts in its papers that because the officers did not commit any "flagrant misconduct," the "harsh remedy of suppression" is unwarranted.

---

[11] In particular, the government's counsel agreed that if a police officer pulled a car over simply on a hunch and saw a gun in the car in plain view, the evidence of the gun would be suppressible.

17

Opposition at 18–19. In support of its proposition, the government relies on Herring v. United States, 555 U.S. 135 (2009). Herring, however, is inapposite. There, the police officers acted based upon a reasonable but mistaken belief that they had an outstanding warrant. 555 U.S. at 137–38. In other words, the officers acted in reasonable reliance on independent, non-police actors. The Court reasoned that suppression under such circumstances would not "meaningfully deter" future Fourth Amendment violations—and therefore was not worth the cost. Id. at 141–44. But here, the officers relied not on an outstanding warrant but rather on their own knowledge of the facts at the time. Therefore, what the government is actually asserting is that even if the officers acted objectively unreasonably, they nevertheless acted reasonably. This is nonsensical. Accordingly, Herring does not apply in this case, and suppression is warranted.

IV. **CONCLUSION**

For the foregoing reasons, Harger's motion to suppress is **GRANTED**.

**IT IS SO ORDERED.**

Dated: June 27, 2018

CHARLES R. BREYER
United States District Judge